IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SAROJINI S. DEONARAIN, f/k/a SAROJINI D. LORD, | ) ) ) | |
| Plaintiff, | ) ) | 8:04CV466 |
| vs. | ) ) | MEMORANDUM AND ORDER |
| NEW YORK LIFE INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

This matter is before me pursuant to 28 U.S.C. § 636 and the consent of the parties on defendant's MOTION FOR SUMMARY JUDGMENT (Filing 21). Having considered the briefs and evidence submitted by the parties (Filings 22, 23, 24, 25, 28 and 29), I find that the motion should be granted.

Plaintiff's former husband, John L. Lord, is a participant in and payee of the NYLIC Retirement Plan ("Plan"), which is administered by the defendant. Plaintiff brought this action under section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1)(B) ("ERISA") to recover benefits allegedly due her pursuant to a Qualified Domestic Relations Order ("QDRO"). Plaintiff contends the QDRO requires defendant to pay her a lump sum for benefits that accrued between the time of the original dissolution decree (March 31, 1998) and the time defendant approved the QDRO (October 2003). Defendant contends the QDRO requires that the benefit be computed as of March 31,

1998, but does not require that payment be made to the plaintiff for the period from April 1, 1998 through October 31, 2003.

## I. JURISDICTION AND VENUE

This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) and (f). Venue in this district is proper under 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2).

## II. FINDINGS OF FACT

Plaintiff was formerly married to John L. Lord. The marriage was dissolved on March 31, 1998 in the District Court for Douglas County, Nebraska.

Mr. Lord has been a participant in and payee of the NYLIC Retirement Plan ("Plan"), which is administered by the defendant. The Plan is a "qualified plan"[1] governed by ERISA. The benefit in question is payable as a monthly single life annuity. Under such a plan, the later one retires, the higher the dollar amount of the monthly benefit because the retiree is expected to collect benefits for a shorter period of time. A person who retires earlier is expected to collect benefits for a longer period of time and is paid a lower monthly benefit. In either case, the actuarial value of the benefit paid from benefit commencement through the expected date of death is the same. (Filing 22-2 ¶ 11).

---

[1] The term "qualified plan" is not defined in ERISA but is often used synonymously with "tax qualified plan" under section 401(a) of the Internal Revenue Code. *See* 26 U.S.C. § 401(a) & 29 U.S.C. § 1132(b). The court in *Craig v. Craig*, 204 B.R. 756 (Bankr. D.N.D. 1997), discussed this issue at length and concluded that qualification under the Internal Revenue Code is not necessary for ERISA qualification; an "ERISA qualified plan" need only contain anti-alienation provisions and be otherwise subject to ERISA. 204 B.R. at 760. The anti-alienation provision of the plan at issue in this case is found at Section 15.6 of the Plan.

-2-

Some time after the dissolution, plaintiff became aware of Lord's interest in the Plan and, during 2002 and 2003, sought the entry of a Qualified Domestic Relations Order[2] determining her right to benefits under the Plan and establishing her as an alternate payee[3] under ERISA. An Amended Qualified Domestic Relations Order (the "QDRO") was entered on September 16, 2003 and was accepted and approved by the defendant in October 2003. The QDRO provides, at Section II:

> A. It is the intention of the parties who were married on May 15, 1981 and divorced on March 31, 1998, that this Order shall constitute a Q.D.R.O. in accordance with the [Retirement Equity Act of 1984 ("Act")] and as defined in Section 414(p) of the [Internal Revenue Code ("Code")] and that the provisions herein shall be administered in accordance with the Act. It is also the intention of the parties that a percentage of Participant's [Lord's] benefits be paid to Alternate Payee [plaintiff] as set forth in Section III of this Order.

---

[2]ERISA, 29 U.S.C. § 1056(d)(1), provides, "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." A Qualified Domestic Relations Order, or QDRO, "is a limited exception to the pension plan anti-alienation provision and allows courts to recognize a nonparticipant spouse's community property interest in pension plans under specific circumstances." *Boggs v. Boggs*, 520 U.S. 833, 839 (1997). More specifically, a QDRO is

> a type of domestic relations order that creates or recognizes an alternate payee's right to, or assigns to an alternate payee the right to, a portion of the benefits payable with respect to a participant under a plan. [29 U.S.C.] § 1056(d)(3)(B)(i). A domestic relations order, in turn, is any judgment, decree, or order that concerns "the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant" and is "made pursuant to a State domestic relations law (including a community property law)." § 1056(d)(3)(B)(ii). A domestic relations order must meet certain requirements to qualify as a QDRO. See §§ 1056(d)(3)(C)-(E).

*Id.* at 846. The definition of "qualified domestic relations order" found in the Internal Revenue Code, 26 U.S.C. § 414(p), is substantially similar to the ERISA definition at 29 U.S.C. § 1056(d)(3)(B).

[3]An "alternate payee" is "any spouse, former spouse, child or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." 29 U.S.C. § 1056(d)(3)(K). *See also* 26 U.S.C. § 414(p)(8).

\* \* \* \*

### III

A.   Alternate Payee is hereby awarded one-half (50%) of the Participant's accrued benefit as of March 31, 1998.

B.   <u>PAYMENT</u>: Payment to the Alternate Payee shall begin at the request of the Alternate Payee, as of the first day of any month coincident with or following the Participant's earliest retirement date as defined under Section 414(p) of the Internal Revenue Code.  Payment to the Alternate Payee shall in all events begin no later than the last date on which payment could begin to the Participant under the Plan assuming his survival to such date.
   The assigned benefit shall be payable as a monthly single life annuity for the life of the Alternate Payee.
   Payment of the Alternate Payee's benefit shall be made pursuant to an Application made by the Alternate Payee within 90 days prior to the Alternate Payee's benefit commencement date on a form prescribed by the Plan Administrator ....
   The monthly amount payable to the Alternate Payee will be the amount that would be payable to the Participant as a single life annuity if it began on the date selected by the Alternate Payee for the payment of her benefit to begin, actuarially adjusted to reflect the substitution of the Alternate Payee's life expectancy for that of the Participant in accordance with the factors and assumptions used to determine such equivalents under the Plan.
   Any benefit payable to the Alternate Payee prior to the Participant's normal retirement date (as defined under the Plan), will be actuarially reduced for early payment in accordance with the same actuarial factors that are applied under the Plan to determine the amount of a benefit commencing to the Participant on such date, prior to any actuarial adjustment to the benefit payable to the Alternate Payee to reflect the substitution of the Alternate Payee's life expectancy as described above.

\* \* \* \*

(Filing 25-3).

The Plan includes the following provisions governing Qualified Domestic Relations Orders:

15.12    Qualified Domestic Relations Orders

15.12.1  For purposes of this Section 15.12, "Qualified Domestic Relations Order" means any judgment, decree or order (including approval of a property settlement agreement) made pursuant to a state domestic relations law ... which relates to the provision of child support, alimony payments or marital property to an "alternate payee", i.e., a spouse, former spouse, child or other dependent of a Participant, and which creates or recognizes the existence of a right of the alternate payee to ... receive all or a portion of the benefits payable with respect to a Participant under the Plan. A Qualified Domestic Relations Order must clearly specify the amount or percentage of the Participant's benefits to be paid to the alternate payee by the Plan (or the manner in which such amount or percentage is to be determined), the number of payments or period to which the order applies and such other information as the Administrator may require as set forth in its procedures for determining the qualified status of a domestic relations order submitted to it. A Qualified Domestic Relations Order (i) may not require the Plan (A) to provide payment to the alternate payee in a form other than in the Normal Form or any other form available to the Participant, excluding, however, a Joint and Survivor Annuity covering the alternate payee and a subsequent spouse; (B) to pay benefits to an alternate payee under such order which are required to be paid to another alternate payee under another such order previously filed with the Plan; or (C) to provide increased benefits (determined on the basis of actuarial equivalents), but (ii) may require payment of benefits to the alternate payee under the order (A) at any time after the date of the order and on or after the earliest date on which the Participant could elect to receive benefits under the Plan (which may be determined in the case of a Participant who has attained age 50 by assuming he or she has separated from service), (B) subject to Section 15.11.3, as if the Participant's Benefit Commencement Date had occurred on the date on which such payment is to begin under the order (taking into account only the present benefits in which the Participant is then vested), and (C) in any form in which such benefits may be paid to the Participant (other than a form excluded under clause (i)(A) above); provided, however, that if the benefit to the alternate payee is an annuity, the lifetime of the alternate payee shall (except as otherwise expressly provided in a Qualified Domestic Relations Order entered prior to January 1, 1995) be substituted for that of the Participant in determining the period and the benefit to be paid and an adjustment shall be made so that the benefit payable to the alternate payee shall be the Actuarial Equivalent of the benefit if paid to the Participant....

15.12.2  The Administrator shall recognize and honor any judgment, decree or order entered on or after January 1, 1985 under a state domestic relations law which it determines to be a Qualified Domestic Relations Order in accordance with such reasonable procedures to determine such status as it shall establish.  Without limitation of the foregoing, the Administrator shall notify the Participant and the person entitled to benefits under a judgment, decree or order which purports to be a Qualified Domestic Relations Order of (i) the receipt thereof, (ii) the Plan's procedure for determining whether such judgment, decree or order is a Qualified Domestic Relations Order, and (iii) any determination made with respect to such status.  During any period during which the Administrator is determining whether any judgment, decree or order is a Qualified Domestic Relations Order, any amount which would have been payable to any person pursuant to the order shall be separately accounted for pending payment to the proper recipient thereof. Any such amount shall be paid to the person entitled to the payment under any such judgment, decree or order if the Administrator determines such judgment, decree or order to be a Qualified Domestic Relations Order within 18 full calendar months commencing with the date on which the first payment would be required to be made under the judgment, decree or order. If the Administrator determines that an order is not a Qualified Domestic Relations Order, including a deemed determination that arises following the 18-month period described in the previous sentence, the Plan shall pay any separately accounted for amounts to the person or persons entitled to such amounts in the absence of the order, but only to the extent that the person is entitled to the payment in accordance with the generally applicable provisions of the Plan; provided, however, that the Administrator may defer payment of the separately accounted for amounts for up to four months (or such other period as it may consider reasonable, but not beyond the end of such 18-month period), if it has received notice that the parties are attempting to cure deficiencies in the order, including notice of a stay issued by the court during the time an appeal of an order is pending.  Any amounts so paid shall fully discharge all obligations of the Plan with respect thereto even if the Administrator should subsequently determine that the order is a Qualified Domestic Relations Order.  Any such subsequent determination shall apply only to amounts which may thereafter be payable under the Plan with respect to so much of the Participant's benefits as have not been previously distributed. The Participant's Retirement Benefit shall be appropriately adjusted to reflect any distribution made pursuant to a Qualified Domestic Relations Order.

   15.12.3  If any Qualified Domestic Relations Order should require payment to any person prior to the actual retirement or other separation from service of a Participant, the portion of the benefits of such Participant payable to the alternate payee shall be actuarially reduced to reflect payment prior to Normal Retirement Date (in accordance with the assumptions specified in Section 2.2) whether or not such payment would, had the Participant actually retired, be paid as an Early Retirement Benefit providing an actuarial subsidy. If payments to the alternate payee begin prior to the Participant's retirement or other Severance from Service and the Participant subsequently retires and becomes eligible for a Retirement Benefit reduced in accordance with Appendix D, the benefit then being paid to the alternate payee shall be recalculated to reflect the reduction factors specified in Appendix D only if the Qualified Domestic Relations Order so provides. In no event shall any such recalculation be applied to payments previously received by the alternate payee.

   15.12.4  Any costs incurred in connection with the Administrator's carrying out its responsibilities (to the extent mandated by section 414(p) of the Code), under this Section 15.11 [sic], including its determination as to whether a domestic relations order submitted to it is a Qualified Domestic Relations Order, shall be a liability of the Plan and Trust to the extent not paid by the Participating Company.  However, the Administrator may treat any other costs reasonably incurred by the Plan in connection with a domestic relations order, such as costs attributable to the refusal of the alternate payee or his or her counsel to comply with the procedures adopted by the Administrator for purposes of facilitating the conforming of domestic relations orders to the requirements necessary for them to constitute a Qualified Domestic Relations Order, as liabilities of the alternate payee.  In that case, no distribution shall commence to an alternate payee under a Qualified Domestic Relations Order unless such costs to the Plan have been reimbursed or the alternate payee has entered into an agreement with the Plan under which payments to the alternate payee are reduced in an aggregate amount equal to such costs.

(Filing 22-5 at pp. 88-92).

 Section 2.37 of the Plan defines "Normal Retirement Date" as "the last day of the calendar month in which a Participant attains his or her Normal Retirement Age."  The term

"Normal Retirement Age" is defined at § 2.35 as "the later of: (a) a Participant's 65th birthday or (b) the earlier of (i) the fifth anniversary of the date the Participant commenced participation in the Plan or (ii) the first day following the Participant's 65th birthday on which he or she is credited with at least 5 years Vesting Service." (Filing 22-5 at pp. 10-11).

Section 2.17 of the Plan defines "Early Retirement Date" as "the date on which a Participant who has completed twenty (20) years of Vesting Service ... elects to retire prior to his or her Normal Retirement Date." Under Section 6.2.2 of the Plan, a participant who has retired early before age 65 may receive a monthly benefit for life, payable in the Normal Form.[4] Such payments are adjusted in accordance with certain discount factors. (Filing 22-5 at p. 31).

Mr. Lord's date of birth is March 7, 1942. He started working as an agent for NYL in April 1971; thus, his Early Retirement Date was April 1991. (Filing 22-2 ¶ 7). His Normal Retirement Date will occur in March 2007. Mr. Lord has not yet retired, and he is not receiving an early retirement benefit. *Id*. at ¶¶ 8 & 12.

The Plan gives its Administrator the following powers and discretion:

> 12.2   <u>Powers and Discretion</u>. The Administrator shall have all powers and discretion necessary or helpful for the carrying out of its responsibilities, and without limiting the generality of the foregoing, shall have the power and complete discretion to:

---

[4]The term "Normal Form" is defined at § 2.34 of the Plan as, "A life annuity, payable monthly in an amount equal to one-twelfth of the annual amount of the Participant's Retirement Benefit, beginning on the Benefit Commencement Date and ending with the payment made for the month of the Participant's death." "Monthly Payments" under the Plan for any calendar month are paid as of the first day of the month. Plan § 7.5.

(a) Determine all questions arising out of or in connection with the provisions of the Plan or its administration, including, without limitation, the power and discretion to resolve ambiguities, to determine relevant facts, to rectify errors, and to supply omissions;

(b) Make rules and regulations for the administration of the Plan which are not inconsistent with the terms and provisions of the Plan;

(c) Construe all terms, provisions, conditions, and limitations of the Plan;

(d) Determine all questions relating to the eligibility of persons to receive benefits hereunder, and all other matters upon which the benefits or other rights of a Participant or other person shall be based hereunder;

(e) Determine all questions relating to the administration of the Plan (1) when disputes arise between the Company, Participating Company or Nonparticipating Affiliate and a Participant or his beneficiary, spouse or legal representatives, and (2) in order to promote the uniform administration of the Plan for the benefit of all parties concerned;

(f) Compute the amount of retirement income and any other benefits payable, and direct the Trustee as to the method by which and persons to whom benefits or expenses hereunder will be paid;

(g) Establish procedures for determining whether a domestic relations order is a qualified domestic relations order ("QDRO") as defined in Section 414(p) of the Code and for complying with any such QDRO;

(h) Determine the method of making corrections necessary or advisable as a result of operating defects in order to preserve qualification of the Plan under Section 401(a) of the Code pursuant to procedures of the Internal Revenue Service applicable in such cases (such as those set forth in Revenue Procedure 2001-17 and similar guidance);

(i) Compromise or settle claims against the Plan and direct the Trustee to pay amounts required in any such settlements or compromise;

(j) Adopt from time to time assumptions for use in all actuarial calculations required in connection with the Plan, and determine with the advice of its actuarial consultant the minimum contribution required to be paid by the Company or Participating Company, as provided in Section 15.9;

(k) Employ such persons and assign to them the performance of such duties as the Administrator shall deem necessary or desirable to assist in the administration of the Plan; and

(l) Determine the expenses of plan administration properly payable under Section 12.17 and direct the Trustee to pay such expenses.

> Benefits under this Plan will be paid only if the Administrator decided in its discretion that the applicant is entitled to them. The determination of the Administrator shall be conclusive and binding on all persons.
>
> * * * *
>
> 12.4    <u>Benefit Determination</u>. The Administrator shall determine in accordance with the terms and provisions of the Plan, the benefits, if any, to which Participants or their beneficiaries may be entitled and shall direct the Trustees to pay or cause to be paid or otherwise distributed, from the assets of the Trust, such benefits, in such amounts, at such time, in such manner or form and to such persons as the Administrator shall determine.

According to the Plan Administrator, once a Plan participant is eligible for early retirement, if the participant continues to remain employed, the participant may not begin collecting a benefit, and the benefit can be paid only after the participant leaves employment. (Filing 22-2 ¶ 12).  Because the Plan does not permit backdating of retirement for its participants, it may not do so for the beneficiary of a QDRO.

Defendant determined that plaintiff was entitled to receive monthly payments of $1,502.81, commencing November 1, 2003.  The defendant Plan's actuarial staff based its calculation of plaintiff's benefit on (a) the understanding that the QDRO awarded plaintiff 50% of Lord's accrued benefit as of the date of the divorce and (b) a benefits commencement date of November 1, 2003, after defendant's receipt of a compliant QDRO.

Payments to the plaintiff began on or about July 1, 2004.  The first payment was $15,140.08, representing payments for the months of November 2003 through July 2004, i.e., eight months of benefits at $1,502.81 per month, plus $3,177.60 in interest for the late payment.  Plaintiff has been receiving monthly payments of $1,502.81 since July 2004 and

will, under the QDRO, be entitled to receive monthly payments of $1,502.81 for the rest of her life.

In this lawsuit, plaintiff has requested an additional lump sum for payments to which she would have been entitled had the QDRO been approved as of the date of the divorce, i.e., for the time period from March 31, 1998 through October 31, 2003. This request was denied by the Plan administrator because Mr. Lord had not retired as of the date the QDRO was entered; consequently, the plaintiff was not eligible under the Plan to receive any benefit prior to the entry of the QDRO.[5] According to the Plan administrator, the Plan does not permit a participant to retire retroactively or request back-dated benefits, and permitting plaintiff to receive benefits retroactively to the date of the dissolution decree would violate the terms of the Plan. Nor are lump sum payments permitted under the Plan except in situations where the entire lifetime benefit is $5,000 or less. The benefit in this case exceeds $18,000 per year. Finally, paying the lump sum now requested would require an actuarial recalculation, which would result in a reduction of plaintiff's monthly benefit to $1,050.00 per month. Further reductions may also be necessary to compensate for the higher monthly benefit that has been paid to plaintiff since July 2004.

---

[5]NYLIC explained its decision to plaintiff in a letter dated June 15, 2004 (Filing 25-3):

Your letter of June 3, 2004 requests payments retroactive back to January 1998. However, a proposed QDRO relating to Mr. Lord's retirement benefits was not submitted to the Plan Administrator until late 2002, and a revised version of the QDRO was not approved by the Plan Administrator until October, 2003. Therefore, you are entitled to a lump sum payment for the eight-month period from November 1, 2003, the first day of the month following the date the Plan Administrator approved the final QDRO, until June 30, 2004.

### III.  CONCLUSIONS OF LAW

#### A.  Standard of Review

##### 1.  ERISA

Under ERISA, a plan beneficiary has the right to judicial review of a benefits determination. *See* 29 U.S.C. § 1132(a)(1)(B).  "Where a plan gives the administrator 'discretionary authority to determine eligibility for benefits,' we review the administrator's decision for an abuse of discretion."  *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  The Plan at issue in this case gives the administrator discretionary authority to determine eligibility for benefits.

A plan administrator's interpretation of a QDRO is reviewed *de novo*. *Hogan v. Raytheon Co.*, 302 F.3d 854, 856-57 (8th Cir. 2002) (citing *Samaroo v. Samaroo,* 193 F.3d 185, 189 (3d Cir. 1999)).

Accordingly, this court will review the Plan administrator's interpretation of the Plan itself for abuse of discretion.  The court will review *de novo* the Plan administrator's interpretation of the QDRO.

##### 2.  Fed. R. Civ. P. 56

Under Fed. R. Civ. P. 56, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c); *Harder v. ACandS*, 179 F.3d 609, 611 (8th Cir. 1999). "In making this determination, the function of the court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely, to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson*, 477 U.S. at 248).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *See Tenbarge v. Ames Taping Tool Sys., Inc.*, 128 F.3d 656, 657-58 (8th Cir. 1997). Accordingly, a party moving for summary judgment must "set forth in the brief in support of the motion for summary judgment a separate statement of material facts as to which the moving party contends there is no genuine issue to be tried and that entitle the moving party to judgment as a matter of law." NECivR 56.1(a)(1).

In the face of a properly supported motion, "[t]he burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Prudential*

*Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998) (quoting Fed. R. Civ. P. 56(e)).  A nonmoving party may not rest upon the mere allegations or denials of its pleadings, but rather, must set forth specific facts, supported by affidavits or other proper evidence, showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919, 922 (8th Cir. 1998).  In this respect, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts;' ... [i]t must show there is sufficient evidence to support a jury verdict in [its] favor."  *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998).  Accordingly, the nonmoving party must "include in its brief a concise response to the moving party's statement of material facts," and specifically identify any points of disagreement.  *See* NECivR 56.1(b)(1) & (2).

Having carefully reviewed the record, I find that no issues of material fact exist, that only questions of law remain outstanding, and the case should be decided on summary judgment.

**B.  Discussion**

The issue presented in this case is whether the QDRO requires the defendant Plan to pay benefits to the plaintiff covering the time period from March 31, 1998 through October 31, 2003.  In resolving this issue, the court will review the QDRO *de novo* and will give deference to the Plan administrator's interpretation of the Plan itself.

The QDRO clearly indicates that the intention of the state district court was to create a Qualified Domestic Relations Order in accordance with the Retirement Equity Act of 1984 and Section 414(p) of the Internal Revenue Code. I find that the September 16, 2003 QDRO order meets the requirements of 29 U.S.C. 1056(d)(3)[6] and is a qualified domestic relations order governed by ERISA.

---

[6]Under ERISA, 29 U.S.C. 1056(d)(3):
[(B)(i)] the term "qualified domestic relations order" means a domestic relations order–
   (I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and
   (II) with respect to which the requirements of subparagraphs (C) and (D) are met, and
  (ii) the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which--
   (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
   (II) is made pursuant to a State domestic relations law (including a community property law).
 (C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies–
   (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
   (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
   (iii) the number of payments or period to which such order applies, and
   (iv) each plan to which such order applies.
 (D) A domestic relations order meets the requirements of this subparagraph only if such order–
   (i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,
   (ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and
   (iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

The QDRO awarded plaintiff "one-half (50%) of [John Lord's] accrued benefit as of March 31, 1998." This award was ordered payable to the plaintiff as "a monthly single life annuity" and could be paid "as of the first day of any month coincident with or following [Lord's] earliest retirement date [April 1991] as defined under Section 414(p) of the Internal Revenue Code" but "no later than the last date on which payment could begin to [Lord] under the Plan assuming his survival to such date." Significantly, the QDRO required the plaintiff to separately apply for the benefit on a form prescribed by the Plan Administrator.

A QDRO cannot "require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan" and cannot "require the plan to provide increased benefits (determined on the basis of actuarial value)." 29 U.S.C. § 1056(d)(3)(D)(i) & (ii).

In this case, the participant, John Lord, could not receive annuity payments from the Plan when the QDRO was entered because he had not yet retired. In this situation, the plaintiff, as alternate payee, could request payment of benefits to her; however, the QDRO required that the plaintiff make a separate application for payment in accordance with the Plan and provided that any payments to the plaintiff made prior to John Lord's normal retirement date (March 2007), would be actuarially reduced for early payment. Section 15.12.1 of the Plan acknowledges that a QDRO may require payment of benefits to an alternate payee "at any time ***after the date of the order*** and on or after the earliest date on which the Participant could elect to receive benefits under the Plan." (Emphasis added).

Reviewing the QDRO *de novo* in conjunction with the applicable statutes and the language of the NYLIC Retirement Plan, I find that the state district court intended to convey to plaintiff a benefit payable as a monthly single life annuity for the life of the plaintiff in accordance with the terms of the Plan. The value of the annuity was to be determined based on John Lord's accrued benefit in the Plan as of March 31, 1998 and actuarial calculations based on the date of the QDRO and the plaintiff's life expectancy. The Plan could not pay any benefits to the plaintiff until after an acceptable QDRO was entered and after the plaintiff applied for benefits.

For these reasons, the sentence in the QDRO stating that plaintiff was awarded "one-half (50%) of the Participant's accrued benefit as of March 31, 1998," cannot be construed to mean that plaintiff was awarded a lump sum to be paid by the Plan, representing the amount of monthly payments she would have received for the period from April 1, 1998 through October 31, 2003 had the QDRO been entered at the time of the dissolution decree and had she applied for benefits at that time. Rather, as the result of any delay in entering the QDRO, the plaintiff is receiving higher monthly payments from the Plan than she would have received if the payments commenced on April 1, 1998.

Finally, Plaintiff contends the defendant should be equitably estopped from refusing to pay the lump sum after it determined that the QDRO constituted a valid qualified domestic relations order and "allowing Plaintiff to rely on such determination to her detriment." Filing 24 at p. 9. Apparently, this argument is based on "frustrated attempts of Plaintiff's counsel

to obtain information concerning The NYLIC Retirement Plan via discovery requests and subpoena" during the dissolution proceeding. *See* Filing 24 at p. 3. The defendant has filed evidence (*see* #28) indicating that it did produce responsive documents in January 1998.

The elements of equitable estoppel are

> [a]s to the party estopped, (1) making a false representation, concealing material facts, or conveying the impression the facts are other than those the party subsequently asserts, (2) intending or expecting this conduct will influence the other party, and (3) knowledge of the true facts. As to the other party, (4) lack of knowledge and the means of knowledge of the true facts, (5) good faith reliance on the conduct or statements of the estopped party, and (6) a detrimental change of position.

*Roeder v. Metropolitan Ins. & Annuity Co.*, 236 F.3d 433, 437 n.2 (8th Cir. 2001). In this case, I find that none of the elements of equitable estoppel have been met. In any event, the QDRO does not contemplate the payment of the lump sum demanded by the plaintiff.

For all the reasons discussed herein,

**IT IS ORDERED**:

1. Defendant's MOTION FOR SUMMARY JUDGMENT (Filing 21) is granted.

2. Since plaintiff's claims have all been resolved, a separate judgment will be entered contemporaneously with this Memorandum and Order.

**DATED August 18, 2005.**

> **BY THE COURT:**
>
> **s/ F.A. Gossett**
> **United States Magistrate Judge**